IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN BRISCO, | § | |
| | § | No. 148, 2024 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. Id. No:   1502007987 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted:  November 20, 2024
Decided:     January 27, 2025

Before **VALIHURA**, **TRAYNOR**, and **LEGROW** Justices.

## <u>ORDER</u>

This 27th day of January, 2025, after consideration of the parties' briefs, the argument of counsel, and the record on appeal, it appears to the Court that:

(1)    John Brisco was convicted of two counts of first-degree murder, attempted first-degree robbery, first-degree conspiracy, second-degree conspiracy, gang participation, and related firearms offenses.  Brisco was sentenced to an aggregate of two life terms plus 35 years of incarceration.  Following his convictions, which we affirmed on direct appeal, Brisco filed a motion for postconviction relief under Superior Court Criminal Rule 61, alleging ineffective assistance of counsel.  The Superior Court denied Brisco's motion for postconviction relief, and Brisco filed this appeal.  For the reasons that follow, we affirm.

(2) On the evening of February 6, 2013, Ioannis Kostikidis was shot and killed while standing by his car in a parking lot in Wilmington. The parking lot was located at 603 North Tatnall Street. Kostikidis's cause of death was a single gunshot wound to his upper body. At 8:55 p.m., the Wilmington Police Department received a report of recent gunshots near 6th and Tatnall. [1] The caller said that there was a man laying on the ground in a parking lot and that she saw two boys running away from the scene.[2] Police arrived on scene shortly after that and found a 9-millimeter shell casing at the scene of the crime.

(3) On January 18, 2015, Devon Lindsey was found dead inside a minivan on the 700 block of East 26th Street in Wilmington.[3] Police officers discovered Lindsey's body just past midnight after they received calls about shots being fired in the area.[4] The driver's door of the minivan was riddled with gunshots, and Lindsey had been shot in the head.[5]

(4) On January 24, 2015, at 8:03 p.m., William Rollins was shot and killed near 21st and Washington Streets in Wilmington. Rollins had been shot multiple times in the head and upper body. The medical examiner collected a .357-caliber

---

[1] *See* Trial Tr. 112, Mar. 7, 2017; State's Ex. 28.
[2] *See* State's Ex. 28.
[3] Trial Tr. 99–109, Mar. 9, 2017.
[4] *Id.* at 99.
[5] *Id.* at 104, 107.

bullet from Rollins's head, and police found 9-millimeter shell casings at the crime scene.

(5) The day following Rollins's murder, Kadir McCoy was arrested for robbing a bank on Union Street in Wilmington.[6] When police took McCoy into custody, police found a Ruger P85 9-millimeter pistol nearby.[7] While in prison, McCoy attempted to send Brisco a letter instructing Brisco to get rid of another gun that was in McCoy's house. Prison authorities intercepted the letter and found a gun connected to Rollins's murder at McCoy's house. The Wilmington Police Department's investigations into the shootings and murders described above revealed that a gang named "Touch Money Gang," also known as "TMG," was involved. Brisco was identified as a member of the gang.

(6) In February 2015, Brisco was indicted with numerous other gang members on multiple charges, including gang participation, three counts of first-degree murder, and related firearms offenses, all charges relating to the shooting deaths of Kostikidis, Lindsey, and Rollins. Before trial, the State made Brisco a plea offer, which he rejected.[8]

---

[6] *See* Answering Br. at 7, *Brisco v. State*, 186 A.3d 798, 2018 WL 2171231 (Del. May 10, 2018) (TABLE) (No. 307, 2017).

[7] *Id.*

[8] The State offered to reduce the charges for the murders of Lindsey and Rollins from first-degree murder to second-degree murder and the murder of Kostikidis from first-degree murder to manslaughter. If accepted, the State would have recommended a sentence no longer than 45 years, with a mandatory minimum of 41 years.

(7)   At trial, the State presented testimony from Kina Madric, Corvon Hammond, and Jakeem Broomer regarding the Kostikidis murder. Madric testified that around 8 p.m. on the evening of February 6, 2013—the same evening that Kostikidis was murdered—two "boys" came to her house looking for Broomer.[9] Madric's house was on the 600 block of North Tatnall Street in Wilmington—the same block where Kostikidis was shot and killed. Madric testified that she heard that one of the boys was named John, and she identified Brisco in a photo line-up as one of the two boys who came to her house looking for Broomer.[10]

(8)   The State called Hammond, who Brisco describes as a "cooperating witness,"[11] but at the outset he was uncooperative. In a recorded interview in September 2015, Hammond had told Detective Martin Lenhardt that he had seen Brisco on Tatnall Street on the day of Kostikidis's murder and heard a gunshot. But when questioned by the prosecutor at trial, he claimed that he had no recollection of the day in question. Nor could he recall meeting with the prosecutor and Detective Lenhardt less than two weeks before his trial testimony. And when pressed about his lack of recall, Hammond announced that he had "said enough," twice stating that he was "not talking."[12]

---

[9] Trial Tr. 31, Mar. 8, 2017.
[10] *Id.* at 34–35.
[11] Opening Br. at 35.
[12] Trial Tr. 81, Mar. 8, 2017.

4

(9)    In response to Hammond's refusal to testify, the trial judge removed the jury from the courtroom and warned Hammond:

> Now, the questions that have been asked of you is whether or not you recall an event, whether or not you recall talking to [the prosecutor], or that occurred [sic]. He's not asking you the substance of the conversation yet. He's simply asking you whether the conversation occurred. You have no Fifth Amendment right to reject saying that, to answering those questions. So unless you want to stay in jail for an extended period of time, you need to answer the questions.
>
> Now, if there comes a point in time when you feel that you could incriminate yourself, then I'll consider that. But at the moment there's nothing to prevent you from answering whether or not two weeks ago you recall meeting with [the prosecutor]. I'm pretty positive, sir, you recall that, and I'm pretty positive you recall having the conversation with the detective.
>
> So at the moment, you're lying in Court in front of me. So either you answer the questions, sir, or you will be spending an extended period of time in custody.
>
> Now, that's your option. He's not asking you to answer anything about the event yet. He's not asking you to answer anything about Mr. Brisco. He's asking you whether or not you had a conversation. So, I suggest that, at least at this point in time, you answer the questions. And then we can see how it goes. They have a recording that you gave them, and they're going to play that at some point. So either you cooperate a little bit today, or you just sit in jail. All right?[13]

After receiving this warning, Hammond testified that he recalled his recent meeting with the prosecutor and the detective, but stood by his earlier testimony that he did not recall anything surrounding the Kostikidis murder.

---

[13] *Id.* at 81–83; *see also* App. to Answering Br. at B9.

(10)   As permitted by 11 *Del. C.* § 3507[14] and without objection, Hammond's recorded statement to police was played for the jury.  In his statement, Hammond said that, on the evening of February 6, 2013, he was on the steps outside Madric's house with Brisco and Damiere Wisher.  Hammond said that Wisher told him that Wisher and Brisco were going to rob someone.  Wisher then identified a person walking by on the sidewalk as the person that Wisher and Brisco were going to rob.  Hammond also said that, although he did not see the robbery or shooting take place, he heard a gunshot.

(11)   The State also called Broomer as a witness in its case-in-chief. Broomer had been interviewed by Detective Lenhardt in March 2013 and February 2014 and by Detective Thomas Curley in February 2014.  When interviewed by Detective Curley, Broomer said that he had spoken to Brisco on the phone the day Kostikidis was murdered and that Brisco had confessed to shooting Kostikidis. When Broomer was called to testify at trial, however, he was uncooperative—he would not identify himself to the court or say whether he knew Brisco.  When pressed by the prosecutor to answer the questions, Broomer said, "Now, I'm not

---

[14] Under 11 *Del. C.* § 3507, "[i]n a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value . . . regardless of whether the witness' in-court testimony is consistent with the prior statement or not."

answering no more questions."[15]  The trial judge again removed the jury from the courtroom and warned Broomer:

> Mr. Broomer, we can play the game that you are playing at the moment, if you want, but the only end result is that however long you are now in prison will be dramatically increased, because as long as you continue to refuse to answer questions that are not going to incriminate you, I will sentence you to a longer period of prison.  Now you may not care about that, but that's the situation.
>
> Now, if you answer questions that have no particular relevance to the events that you don't want to talk about, that's understandable, but not answering the question as to whether or not you even know somebody—which we do know you know that person.  Okay?  It's not a surprise to anyone.  So for you to say, sure I know Mr. X, or I know Y, doesn't hurt you at all, doesn't incriminate you, it doesn't put you in jeopardy, doesn't require anything from the Court to do but ask questions.
>
> Now, when you get to the point where they may ask you some questions about an event and you don't want to answer that, you can simply say I don't know, I don't remember, however you want to do it, that's your call.  But to sit here and not answer questions is simply going to see how long I can put you in jail.  So, if you don't care about that, that's fine, but I assure you, sir, you will be quite aged by the time you get out of jail because, at the moment, you're lying in front of me and I will hold you in contempt.[16]

After receiving this warning, Broomer testified that he knew Brisco.  When asked whether he remembered talking to police about the Kostikidis murder, Broomer said he did not recall talking to them.

---

[15] Trial Tr. 38, Mar. 9, 2017.

[16] App. to Answering Br. at B11–12.

(12) Broomer's three recorded statements to police were then played for the jury. In Broomer's third statement, which he made to Detective Curley in February 2014 while he was facing his own robbery charges, Broomer said that, during a telephone conversation on the evening of February 6, 2013, Brisco admitted to killing Kostikidis with a 9-millimeter during a robbery gone bad.

(13) In addition to the testimony of Madric, Hammond, and Broomer, the State presented GPS evidence that placed Brisco near the scene of Kostikidis's murder. This evidence was derived from a GPS monitoring device that Brisco was wearing as a condition of a period of probation he was then serving. Probation Officer Robert Johnson testified about the GPS monitoring device and Brisco's reported locations on the night in question. A report detailing Brisco's locations on the evening of February 6 was entered into evidence without objection. According to the GPS report, Brisco was at 641 North Tatnall Street—about half a block from where Kostikidis was murdered—for a period of sixteen minutes, from 8:42:03 p.m. to 8:58:04 p.m. Officer Johnson explained to the jury that the GPS monitoring device generated Brisco's location through cell phone towers using a triangulation method and that it had a 30-meter range of accuracy. Defense counsel objected to Officer Johnson's testimony pertaining to the 30-meter range of accuracy, but the trial court overruled the objection.

8

(14) The State presented testimony from Karel Blalock in support of the allegation that Brisco murdered Rollins. Blalock had spoken to police about the Rollins murder after Blalock had been charged with robbery and weapons offenses. Blalock testified that he had known Brisco for several years and that Brisco had told him about Rollins's murder. Blalock testified that Brisco told him that Brisco had shot Rollins 11–12 times in the back while Rollins was walking on 21st Street.[17] Blalock further testified that Brisco told him that McCoy then walked over to Rollins and shot Rollins in the back of the head with a .357-caliber gun.[18] Blalock testified that Brisco told him that he was paid $13,000 for killing Rollins.

(15) The final witness at trial was Detective Christian Flaherty, who testified for almost a full day. He testified as an expert witness in gang and social media investigations and as a lay witness based on his own personal experience investigating Brisco. Detective Flaherty testified about his experience as the chief investigating officer in approximately fifty shootings and ten homicides, as well as his experience as an intelligence officer with the Wilmington Police Department's Realtime Crime Center. He described certain characteristics that linked individuals to certain gangs and identified Brisco as a member of the Touch Money Gang. During his testimony, Detective Flaherty described information that he had learned

---

[17] *See* Answering Br. at 7, *Brisco v. State*, 186 A.3d 798, 2018 WL 2171231 (Del. May 10, 2018) (TABLE) (No. 307, 2017).
[18] *Id.*

9

from observing and monitoring the social media accounts of Touch Money Gang members, including Brisco. He explained that the first thing he assesses when investigating a gang, such as the Touch Money Gang, is whether crimes or "predicate" offenses have been committed by members of that gang.[19] Toward the end of his testimony, the detective identified three predicate offenses that he had "tied" Brisco to during his investigation—the murder of Kostikidis, the murder of Lindsey, and the murder of Rollins.[20]

(16) During closing argument, Brisco's trial counsel revisited the GPS evidence that had been presented by the State during Officer Johnson's direct examination. Defense counsel argued to the jury:

> Now, here's the address of where this murder occurred, 603 Tatnell [sic] Street. What those ankle bracelet records don't say, they don't say [Brisco] was at 603 Tatnell [sic] Street. They say he was at 641 Tatnell [sic]. There's a difference. If he was at 603, the records would say it. So those GPS records, they don't implicate John, they exonerate him."[21]

(17) Brisco was convicted of two counts of first-degree murder for the murders of Kostikidis and Rollins, attempted first-degree robbery, first-degree conspiracy, second-degree conspiracy, gang participation, and several related firearms offenses. Brisco was acquitted of the third count of first-degree murder for

---

[19] App. to Opening Br. at A447.
[20] *Id.* at A434–35.
[21] *Id.* at A284.

10

the murder of Lindsey and related charges. This Court affirmed Brisco's conviction on direct appeal.[22]

(18) In 2018, Brisco filed a timely motion for postconviction relief under Superior Court Criminal Rule 61. Brisco was appointed new counsel, who filed an amended motion and brief in July 2023. In the amended motion, Brisco identified seven performance deficiencies on the part of his trial counsel in support of his claim that his trial counsel's ineffective assistance deprived him of his Sixth Amendment right to counsel. The Superior Court denied the motion.[23] Brisco now appeals the Superior Court's denial of his motion for postconviction relief.

(19) On appeal, Brisco advances only three of the arguments that he raised below. Brisco argues that his trial counsel was ineffective for: (1) arguing to the jury that the GPS evidence exonerated Brisco and incorrectly advising Brisco about the strength the GPS evidence prior to trial; (2) failing to object to Detective Flaherty's testimony as improper expert and lay-witness testimony and summary testimony; and (3) failing to object to the trial court's improper warning to both Hammond and Broomer when they became uncooperative while on the witness

---

[22] *See Brisco v. State*, 186 A.3d 798, 2018 WL 2171231 (Del. 2018) (TABLE). On direct appeal, Brisco argued that the trial court erred in allowing Officer Johnson to testify about the range of the accuracy of the GPS ankle monitor that Brisco was wearing at the time of Kostikidis's murder. We concluded that any error made was harmless because Brisco did not challenge the general accuracy of the GPS monitor and there was overwhelming evidence placing him in the vicinity of the murder.

[23] *State v. Brisco*, 2024 WL 1555494 (Del. Super. Ct. Apr. 9, 2024) [hereinafter "Opinion"].

stand. In addition to these ineffective-assistance-of-counsel claims, Brisco claims that the Superior Court erred in failing to grant an evidentiary hearing and consider his claim of cumulative error.

(20) We review the Superior Court's denial of a motion for postconviction relief for abuse of discretion.[24] We review legal or constitutional questions, including claims of ineffective assistance of counsel, *de novo*.[25] Before addressing any substantive issues, we first consider the procedural requirements of Superior Court Criminal Rule 61 to determine whether the claims are procedurally barred.[26]

(21) In determining whether Brisco's claims were procedurally barred, the Superior Court erroneously applied an outdated version of Rule 61(i).[27] Despite that error, we agree with the court's conclusion that Brisco's claims are not barred. We note, too, that the State does not contend that any of Brisco's claims are procedurally barred.

(22) To prevail on an ineffective-assistance-of-counsel claim, a defendant must satisfy the two-part test from *Strickland v. Washington*.[28] The defendant must demonstrate that (i) "counsel's representation fell below an objective standard of

---

[24] *Cooke v. State*, – A.3d –, 2025 WL 16395, at *22 (Del. Jan. 2, 2025).
[25] *Id.*
[26] *Id.*
[27] *See* Opinion at *2. In its Opinion, the Superior Court referred to the "miscarriage of justice" exception, which was removed from Superior Court Criminal Rule 61(i)(5) in 2014. *See* Order Amending Super. Ct. Crim. R. 61 (June 4, 2014); *Cooke*, 2025 WL 16395, at *23.
[28] 466 U.S. 668 (1984).

12

reasonableness,"[29] and (ii) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[30] Under the first part of the *Strickland* test—the performance prong—there is "a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."[31] Where "an attorney makes a strategic choice after thorough investigation of law and facts relevant to plausible options," the presumption that an attorney acted reasonably is "virtually unchallengeable."[32] The defendant bears the burden in overcoming this presumption.[33] As to the second part of the test—the prejudice prong—the defendant must demonstrate "[a] reasonable probability sufficient to undermine confidence in the outcome," which "requires a 'substantial,' not just 'conceivable,' likelihood of a different result."[34]

(23)    Brisco first claims that his trial counsel was ineffective in how he handled the State's GPS evidence against Brisco during both the trial and plea stages. Specifically, Brisco claims that his trial counsel was ineffective when he argued to the jury during closing arguments that the GPS evidence did not "implicate" Brisco, but rather that it "exonerate[d]" him. Additionally, Brisco claims that his trial

---

[29] *Id.* at 688.
[30] *Id.* at 694.
[31] *Green v. State*, 238 A.3d 160, 174 (Del. 2020) (quoting *Strickland*, 466 U.S. at 689).
[32] *Purnell v. State*, 106 A.3d 337, 342 (Del. 2014) (quoting *Hoskins v. State*, 102 A.3d 724, 730 (Del. 2014)).
[33] *See Green*, 238 A.3d at 174.
[34] *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011).

counsel was ineffective for informing Brisco that he had a "definitive alibi," which in turn influenced Brisco's decision to reject the State's plea offer.[35]

(24) Brisco claims that it was unreasonable for his trial counsel to argue that the GPS evidence exonerated Brisco because "[a]nything more than the most cursory review of the records would have shown that the GPS report provided a location range, not an exact location."[36] Brisco goes so far as to claim that trial counsel misunderstood the GPS evidence. Trial counsel flatly denied that he misunderstood the GPS evidence, claiming instead that he made a strategic decision to highlight the discrepancy between where the GPS evidence placed Brisco and where Kostikidis's murder actually occurred. In trial counsel's mind, it would have been "a gross deviation to ignore the GPS evidence and not use it to his advantage."[37]

(25) We conclude that trial counsel's decision to argue that the GPS evidence exonerated Brisco did not fall below an objective standard of reasonableness. As Brisco notes, the GPS evidence provided a location range rather than an exact location. This means that Brisco could have been anywhere within a 30-meter radius of 641 North Tatnall Street, a fact that defense counsel believed he could use to create reasonable doubt in the minds of the jury. This strategic decision, though far from foolproof, was not in our view objectively unreasonable. Even if

---

[35] Opening Br. at 17.
[36] *Id.* at 10.
[37] App. to Opening Br. at A155.

trial counsel's decision was unreasonable, Brisco's claim does not satisfy the prejudice prong of *Strickland*. The evidence that Brisco shot Kostikidis was substantial—Madric and Hammond saw him near the crime scene, Broomer heard him confess to the murder, and the GPS confirmed that Brisco was on Tatnall Street around the time Kostikidis was murdered. The fact that trial counsel stated during closing argument that the GPS evidence exonerated Brisco does not render the other evidence of Brisco's guilt any less persuasive. Consequently, we are not persuaded that, but for trial counsel's argument that the GPS evidence exonerated him, there is a reasonable probability that the outcome of his trial would have been different.

(26) Brisco claims that trial counsel gave him ineffective advice— particularly about the strength of the GPS evidence and its ability to provide a definitive alibi—before trial that prevented Brisco from making an informed decision to reject the State's plea offer. To prevail on this claim, Brisco must show that, but for trial counsel's ineffective advice, there is a reasonable probability that Brisco would have accepted the plea offer.[38]

(27) Brisco does not describe any specific advice that trial counsel gave him, nor does he contend that trial counsel pressured him to reject the State's plea offer.

---

[38] *See Burns v. State*, 76 A.3d 780, 785 (Del. 2013) (quoting *Lafler v. Cooper*, 566 U.S. 156, 164 (2012)) ("[B]ut for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., *that the defendant would have accepted the plea* and the prosecution would not have withdrawn it in light of intervening circumstances) . . . .") (emphasis added).

The Superior Court found that "Brisco voluntarily and clearly rejected the plea" and "[t]here is no evidence that trial counsel put pressure on [Brisco] to reject the plea."[39] This finding is not clearly erroneous and is supported by the record. Thus, Brisco has failed to meet his burden to demonstrate that his trial counsel acted in a manner that was objectively unreasonable. Nor has Brisco established that, but for his counsel's advice, he would have accepted the State's plea offer. Brisco's claim fails under both *Strickland* prongs.

(28) Brisco next claims that his trial counsel was ineffective for failing to object to Detective Flaherty's testimony. Brisco argues that Detective Flaherty did not qualify as either an expert witness or lay witness in this case and that Detective Flaherty gave improper summary testimony. Brisco also argues that, although it is common for police officers to testify as both expert and lay witnesses, it was unreasonable for trial counsel not to object to Detective Flaherty's testimony because it "ran afoul of permissible dual witness testimony."[40] The Superior Court found these claims to be meritless. We agree. Detective Flaherty was qualified to testify both as an expert under D.R.E. 702 and as a lay witness under D.R.E. 701. It is common for police officers to testify as both fact and expert witnesses, and Brisco has not provided a "persuasive reason" to "interrupt that practice."[41]

---

[39] Opinion at *6.
[40] Opening Br. at 28.
[41] *Hardin v. State*, 844 A.2d 982 (Del. 2004).

16

(29)   Turning to Brisco's claim that his trial counsel was ineffective for not objecting to Detective Flaherty's testifying as a "summary witness," we note that Brisco concedes that whether to allow summary testimony is within the trial court's discretion.[42]  We note further that Brisco cites no Delaware authority addressing the admissibility of summary testimony nor does he explain how, had his trial counsel objected, its admission during his trial would have been an abuse of discretion. Moreover, the testimony Brisco identifies as objectionable does not appear to be in the form of a summary.  In particular, Brisco complains that

> Flaherty was repeatedly asked to connect social media posts to different events which occurred during the course of the investigation - including the homicides for which Brisco was charged - homicides this "expert" investigated. For example, the State would ask Flaherty to indicate that a certain picture was posted to social media within a few days or months of a specific homicide, or that guns in a photo matched guns used in a specific homicide.[43]

Although this testimony might be objectionable on other grounds, we fail to see how it presents a summary.

(30)   This is not to say that Detective Flaherty's testimony that Brisco was "tied" to the murders of Kostikidis, Lindsey, and Rollins—the same crimes with which Brisco was charged—is not the least bit disquieting.  Our trial courts should

---

[42] Opening Br. at 32.
[43] *Id.* at 32.  This passage is followed by a footnote citing from other brief excerpts of Detective Flaherty's testimony.  Like the passage quoted above, none of the cited excerpts are in the form of a summary.

17

take care to limit summary prosecution witnesses whose testimony merely repeats and bolsters evidence already in the record in a way that unfairly prejudices the defendant. But here we are satisfied that Detective Flaherty's testimony was not unfairly prejudicial to Brisco, as evidenced by the jury's acquittal of Brisco for the Lindsey murder.

(31) Likewise, we are not convinced that the admission of Detective Flaherty's testimony created prejudice of the type required under *Strickland*; put differently, we do not believe that there is a reasonable probability that, but for counsel's failure to object to Detective Flaherty's testimony, the result of Brisco's trial would have been different. We base this conclusion on our view that the other evidence establishing Brisco's guilt was strong. As we have noted above, the evidence concerning the Kostikidis murder was substantial.[44] That is no less true as to the Rollins murder. Recall here that Blalock testified that Brisco gave him a detailed account—one that was consistent with the forensic evidence—of how he shot Rollins numerous times.

(32) Brisco next claims that his trial counsel was ineffective for failing to object to the trial judge's warnings to Hammond and Broomer when they initially refused to testify. Brisco argues that these warnings inappropriately "intimidated" Hammond and Broomer, which in turn lead to them testifying enough for the State

---

[44] *See supra ¶ 25.*

to lay the necessary foundation to introduce Hammond's and Broomer's recorded statements.[45]  According to Brisco, if trial counsel had objected, there is a reasonable probability that Hammond and Broomer would have chosen not to testify against Brisco and that the outcome of trial would have been different.  The Superior Court found that, because "[a]n objection to the trial judge's warnings would have been unsupported," trial counsel's decision not to object was reasonable.[46]  The Superior Court also found that "[t]he judge acted well within his discretion in providing a warning to the uncooperative witnesses."[47]

(33)  We agree.  For starters, Brisco does not identify the evidentiary basis for the hypothetical objection his trial counsel should have made to the trial judge's warning to the recalcitrant witnesses who were refusing to answer questions, not on Fifth Amendment or other privilege grounds but, because they did not want to.

(34)  In addition to that, the principal case on which Brisco relies, *Webb v. Texas*,[48] does not support his argument.  In *Webb*, the United States Supreme Court found that the "the judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment."[49]  Brisco's case,

---

[45] Opening Br. at 38.
[46] Opinion at *12.
[47] *Id.*
[48] 409 U.S. 95 (1972).
[49] *Id.* at 98.

19

however, differs substantially from *Webb*. Here, the judge's warnings were directed at the State's witnesses rather than the defense's sole witness, and the trial judge's warnings did not prevent Brisco from presenting witnesses in his own defense. Furthermore, the trial judge's warning included a reminder to Hammond and Broomer that they had the right to refuse to answer questions that might incriminate them. Therefore, we find that the trial judge's warnings to Hammond and Broomer did not violate Brisco's due process rights and any objection to those warnings would have been unsupported. Because any objection would have been unsupported, trial counsel's decision not to object was objectively reasonable. Brisco also fails to provide evidence of prejudice. Brisco has not demonstrated that, had trial counsel objected, it reasonably probable that the trial judge would not have warned the witnesses or that the State would have been unable to use the witnesses' § 3507 statements. Therefore, Brisco has failed to satisfy *Strickland*'s prejudice prong as well.

(35) Brisco next claims that the Superior Court abused its discretion by not scheduling an evidentiary hearing in connection with his postconviction motion. It is within the discretion of the Superior Court to determine whether an evidentiary hearing is necessary in order to decide a motion for postconviction relief.[50] After

---

[50] *See* Super. Ct. Crim. R. 61(h)(1); *Maxion v. State*, 686 A.2d 148, 151 (Del. 1996) ("Rule 61(h)(1) grants the Superior Court discretion in determining whether an evidentiary hearing on a postconviction motion is necessary.").

carefully reviewing the record in this case, we find that the Superior Court acted well within its discretion when it determined that Brisco's postconviction motion did not require an evidentiary hearing.

(36) Brisco's final claim is that the Superior Court erred in failing to consider the cumulative effect of trial counsel's alleged errors. Where there are multiple errors in a trial, this Court weighs their cumulative effect to determine if, combined, they are "prejudicial to substantial rights [so] as to jeopardize the fairness and integrity of the trial process."[51] Because Brisco's individual claims of error are without merit, his claim of cumulative error also fails.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

---

[51] *Hoskins*, 102 A.3d at 735 (quoting *Turner v. State*, 5 A.3d 612, 615 (Del. 2010)); *see also Cooke*, 2025 WL 16395, at *41.